IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| JEFFREY BROWN<br>3300 Towers Blvd. #234<br>Seabrook, TX 77586<br><br>    Plaintiff,<br><br>    -vs-<br><br>VALVOLINE, LLC<br>c/o CT Corporation System<br>306 West Main Street, Suite 512<br>Frankfurt, KY 40601<br><br>    Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 4:22-cv-04059<br><br>JUDGE:<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Now comes Plaintiff Jeffrey Brown and hereby respectfully states his Complaint against Defendant Valvoline, LLC:

**PARTIES, JURISDICTION & VENUE**

1. Mr. Brown brings this action alleging race discrimination in employment under Title VII of the Civil Rights Acts of 1964, 42 U.S.C. § 2000e, *et seq*.

2. Mr. Brown was an employee of the Defendant under 42 U.S.C. § 2000e(f).

3. Defendant Valvoline, LLC is a Kentucky limited liability company that is licensed to conduct business in the Southern District of Texas and regularly conducts business in the District at 1302 Wharton Weems Road, La Porte, Texas. Defendant Valvoline, LLC was Mr. Brown's employer pursuant to 42 U.S.C. § 2000e(b).

4. Jurisdiction is proper pursuant to 28 U.S.C. § 1331 because Mr. Brown is alleging claims arising under the laws of the United States.

5. Venue is proper in the Southern District of Texas because this is the district in which a substantial part of the events giving rise to the claims alleged in this Complaint

occurred. The events occurred at and around 1302 Wharton Weems Road, La Porte, Texas.

6. Within 300 days of the conduct alleged herein, Mr. Brown filed a Charge of Discrimination with the U. S. Equal Employment Opportunity Commission (Charge No. 460-2021-01701).

7. On August 26, 2022, Mr. Brown received a Notice of Right to Sue.

8. Mr. Brown has properly exhausted all of his administrative remedies prior to the filing of this Complaint.

9. Mr. Brown filed this suit within ninety days of receiving his right to sue letter from the EEOC.

**FACTS**

10. Plaintiff incorporates all of the allegations in the preceding paragraphs as if the same were rewritten here.

11. Mr. Brown started working for Valvoline at its La Porte, Texas plant in February of 2020.

12. He came to Valvoline with a wealth of experience in service, manufacturing, supply chain, and management.

13. Mr. Brown served in the U. S. Army and supervised twenty-one soldiers in feeding the largest tactical signal battalion in the U. S. Army (850+ personnel). Mr. Brown was also directly responsible for seventy soldiers and $150 million worth of equipment providing secure telephone service via high frequencies and other means of communications. Because of his exceptional service, Mr. Brown was selected by the

battalion commander to provide service to the brigade commander. Mr. Brown was honorably discharged.

14. Mr. Brown received his business management degree from Western Kentucky University.

15. He went on to work for Toyota Motor Corporation, where he supervised over seventy employees in the production of customer specific parts, and held responsibility for safety, quality, training, and productivity.

16. Mr. Brown also worked for C&K Industrial Services, Inc., where he supervised over fifty employees in the high-risk industrial cleaning and servicing of the second largest electric coal plant in the U. S. Mr. Brown was responsible for safety, quality, customer service, payroll, maintenance, writing bids, hiring and firing of employees, budgeting, and management of staff.

17. Mr. Brown has also worked for Ford Motor Company and Frito-Lay. He came to Valvoline with a proven track record of success.

18. When Mr. Brown started working for Valvoline at its La Porte, Texas plant in February of 2020, he immediately noticed a discriminatory environment.

19. All of the managers were Caucasian. All of the subordinate shift supervisors and material handlers were African American.

20. Mr. Brown had interviewed for a managerial position, and he could not figure out why Dalan Motz, a far less qualified Caucasian (he's no longer employed by Valvoline), was chosen over him until he arrived at the plant and saw how it was organized and operated.

21. The Caucasians were in charge, and the African Americans held inferior positions and were treated unfairly.

22. The Caucasian management failed to provide any orientation or training. Unsurprisingly, the plant was not running smoothly due to these failures of management.

23. Mr. Motz and Frank Harris, the Caucasian plant manager, were under pressure as a result of their mismanagement of the plant. Mr. Motz and Mr. Harris began yelling at, threatening, and blaming their subordinate African American employees. This was a common occurrence. Mr. Harris referred to the African American material handlers as "knuckle heads."

24. The subordinate African American employees knew that they were the scapegoats for their Caucasian management, but they knew to keep quiet if they wanted to keep their jobs. This created racially charged hostility in the workplace, and it affected the African American employees' ability to do their jobs.

25. In May, Mr. Harris called Mr. Brown into his office to have a word with him. With a big smile on his face, Mr. Harris told Mr. Brown that some of the workers on the floor were calling each other "b—h a— n—er," "Uncle Tom n—er," and "punk a— n—er."

26. By the smirk on his face, it was apparent that Mr. Harris took great joy in saying those words to Mr. Brown, *and* he wanted Mr. Brown to be aware of that.

27. Mr. Brown was stunned and highly offended; he had to tell Mr. Harris that he could "just call it the 'n' word" instead of saying the actual word, and then asked him to "stop saying that word now." Mr. Harris then asked Mr. Brown what should be done about the workers; Mr. Brown replied that they should be fired.

28. Mr. Brown reported Mr. Harris to Mr. Harris's supervisor, Rob Shelton.

29. Thereafter, Mr. Harris told Mr. Brown that he "needed more diversity in the workplace," in reference to the large number of African Americans who were employed at the plant.

30. Mr. Harris also made it a point to repeatedly tell Mr. Brown about how smart his new Caucasian administrator was, so smart that he was tasked with tracking attendance.

31. The previous administrator was an African American woman; Mr. Harris did not allow her to track attendance because he thought she was "too close with the hourly employees."

32. Mr. Harris repeatedly blamed Mr. Brown for Mr. Motz's poor management. On one occasion, Mr. Harris changed Mr. Brown's pre-approved bereavement leave to use his floating holidays and vacation days instead. Mr. Brown had to go to Human Resources to have that decision reversed, which angered Mr. Harris.

33. Mr. Motz falsified the attendance records by putting Mr. Brown's initials on dates that were before Mr. Brown's hire date. Mr. Motz was not disciplined for this.

34. Mr. Harris and Motz then summoned Mr. Brown for a meeting. Mr. Motz started the meeting by saying that Mr. Brown needed to go back and verify last year's attendance for twenty people in three days, including verifying months prior to Mr. Brown's employment. Essentially, Mr. Brown was being asked to sign his name confirming the accuracy of employee attendance records for dates that Mr. Brown was not present.

35. Mr. Brown told Motz that it was Motz's responsibility to verify the times, and that he could not sign his name to "verify" attendance when Mr. Brown was not there because that would amount to falsifying records.

36. Mr. Brown reminded Mr. Motz that he had emailed Mr. Motz about getting this done before the end of the year; Mr. Motz lied and said Mr. Brown did not send him any such email.

37. Mr. Harris then asked Mr. Motz if Mr. Brown sent him an email and Mr. Motz responded, "No." Mr. Brown told Mr. Motz that he was not telling the truth. Mr. Harris told Mr. Brown to stop blaming other people.

38. Subsequently, Mr. Motz told Mr. Brown that he has actually already used all of his vacation time up and he would not be going on vacation for a pre-approved vacation the next week.

39. On one occasion, Mr. Harris berated Mr. Brown because Mr. Brown's team did something that Mr. Motz had instructed them to do. When Mr. Brown protests, Mr. Harris calls Mr. Brown a liar and threatens disciplinary action when Mr. Brown tries to set the record straight. Mr. Brown invites Mr. Harris to ask his team whether Mr. Motz had instructed them to do what they were doing, but Mr. Harris does not do so.

40. Then all of a sudden, Mr. Harris and Mr. Motz started going back and forth berating Mr. Brown. Mr. Brown felt very threatened and wanted to get out of Mr. Harris's office and out of the abuse and hostility. Mr. Brown pulled out his phone to call HR and headed for the door.

41. Mr. Harris threatened discipline up to termination if Mr. Brown left his office. Mr. Brown was forced to stay in the office until Mr. Harris let him leave.

42. Mr. Brown made numerous complaints about the racially hostile work environment he was subjected to. In retaliation, Mr. Harris reduced Mr. Brown's job responsibilities and gave him menial tasks doing daily audits.

43. On January 3, 2022, Mr. Brown was constructively discharged: "Due to the ongoing hostile and racist work environment I was subjected to on a regular basis and the lack of HR support, I have decided to resign as of January 3, 2022."

44. Mr. Brown received a response stating, "[w]e are sorry to hear about your resignation. Employee Relations has investigated the concerns you raised prior to your commencement of leave, as well as having investigated your earlier concerns in September 2020 and they were not able to substantiate your claims."

45. Conversely, when Mr. Brown complained to HR about what happened in the meeting with Mr. Harris and Motz, *HR gave Mr. Brown* a final warning because Mr. Harris and Motz reported that Mr. Brown was threatening during the meeting and shook his phone at them, but this did not occur. No one at Valvoline asked Mr. Brown for his side of the story.

46. This shows that Valvoline is willing to substantiate allegations when they are made by Caucasians, but not when they are made by African Americans like Mr. Brown.

## COUNT I
### (Hostile Work Environment Based on Race)

47. Plaintiff incorporates all of the allegations in the preceding paragraphs as if the same were rewritten here.

48. Plaintiff, an African American, was subjected to a hostile work environment.

49. The conduct and comments to Plaintiff were all unwelcome and were sufficiently severe or pervasive so as to alter the conditions of Plaintiff's employment to create a racially hostile and abusive work environment for Plaintiff.

50. A reasonable person in Plaintiff's circumstances would consider the working environment to be abusive or hostile.

51. Defendant knew of the racial harassment directed towards Plaintiff, but they failed to take corrective action.

52. As a direct and proximate result of Defendant's intentional discriminatory conduct, in violation of 42 U.S.C. § 2000e-2, Plaintiff has suffered pecuniary and emotional injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that the Court grant judgment against Defendant as follows:

A. That the Court award Plaintiff past and future compensatory damages, economic and noneconomic, in an amount to be proven at trial;

B. That the Court award Plaintiff punitive damages against each Defendant and their agents, servants and/or employees in an amount to be proven at trial due to their willfulness, wantonness, recklessness and conscious disregard for Plaintiff's rights;

C. That the Court award Plaintiff attorney and expert fees, costs, and interest; and

D. That the Court award Plaintiff such other and further relief as may be just, equitable and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable with the maximum number of jurors permitted by law.

Respectfully submitted,

CHAMBERLAIN ♦ MCHANEY, PLLC
901 S. Mopac Expressway
Barton Oaks Building 1, Suite 500
Austin, Texas 78746
(512) 474-9124
(512) 474-8582 FAX

By: */s/ Melissa Carr*
    MELISSA CARR
    Texas State Bar No. 24065008
    Southern District of Texas Federal ID No. 3667785
    mcarr@chmc-law.com


*Motion for admission *pro hac vice* forthcoming*

LEWIS A. ZIPKIN
Ohio Bar: 0030688
KEVIN M. GROSS
Ohio Bar: 0097343
The Zipkin Whiting Bldg
3637 South Green Road
Beachwood, OH 44122
T: 216-514-6400
F: 216-514-6406
zfwlpa@aol.com
kgross.zipkinwhiting@gmail.com

*Counsel for Plaintiff*