# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| JEFFREY BROWN | § | CIVIL ACTION NO. 4:22-cv-04059 |
| | § | |
| Plaintiff, | § | JUDGE ANDREW S. HANEN |
| | § | |
| -vs- | § | **AMENDED COMPLAINT** |
| | § | |
| VALVOLINE, LLC, | § | *JURY TRIAL DEMANDED* |
| FRANK HARRIS, and | § | |
| DALAN MOTZ | § | |
| | § | |
| Defendants. | § | |

Now comes the Plaintiff, Jeffrey Brown ("Brown"), by and through undersigned counsel, and hereby respectfully states his Amended Complaint against Defendants Valvoline, LLC ("Valvoline"), Frank Harris ("Harris"), and Dalan Motz ("Motz"):

## PARTIES, JURISDICTION, & VENUE

1. Brown brings this action alleging race discrimination in employment under Title VII of the Civil Rights Acts of 1964, 42 U.S.C. § 2000e, *et seq*. and 42 U.S.C. § 1981.

2. Brown, who is African American, was an employee of Valvoline under 42 U.S.C. § 2000e(f).

3. Valvoline is a Kentucky limited liability company that is licensed to conduct business in the Southern District of Texas and regularly conducts business in the district at 1302 Wharton Weems Road, La Porte, Texas. Valvoline is vicariously liable for the unlawful, discriminatory conduct of its agents, employees, and supervisors under the doctrine of *respondeat superior*.

4. Valvoline was Brown's employer under 42 U.S.C. § 2000e(b).

5. Harris and Motz were supervisors of Brown, and both are Caucasian.

6. Jurisdiction is proper pursuant to 28 U.S.C. § 1331 because Brown is alleging claims arising under the laws of the United States.

7. Venue is proper in the Southern District of Texas because this is the district in which a substantial part of the events giving rise to the claims alleged in this Amended Complaint occurred. The events occurred at and around 1302 Wharton Weems Road, La Porte, Texas.

8. Within 300 days of the conduct alleged herein, Brown filed a Charge of Discrimination with the U. S. Equal Employment Opportunity Commission (Charge No. 460-2021-01701).

9. On August 26, 2022, Brown received a Notice of Right to Sue from the EEOC.

10. Brown has properly exhausted all his administrative remedies prior to the filing of the Complaint and this Amended Complaint.

11. Brown filed the Complaint within ninety days of receiving his Notice of Right to Sue from the EEOC.

12. Brown timely filed this Amended Complaint as a matter of course pursuant to FED. R. CIV. P. 15(a)(1)(B).

## FACTS

13. Brown incorporates all the allegations in the preceding paragraphs as if the same were fully rewritten here.

14. Brown started working for Valvoline at its La Porte, Texas plant in February of 2020.

15. He came to Valvoline with a wealth of experience in service, manufacturing, supply chain, and management.

16. Brown served in the U. S. Army and supervised twenty-one soldiers in feeding the largest tactical signal battalion in the U. S. Army (850+ personnel). Brown was also directly

responsible for seventy soldiers and $150 million worth of equipment providing secure telephone service via high frequencies and other means of communications. Because of his exceptional service, Brown was selected by the battalion commander to provide service to the brigade commander. Brown was honorably discharged.

17. Brown received his business management degree from Western Kentucky University.

18. He went on to work for Toyota Motor Corporation, where he supervised over seventy employees in the production of customer specific parts, and held responsibility for safety, quality, training, and productivity.

19. Brown also worked for C&K Industrial Services, Inc., where he supervised over fifty employees in the high-risk industrial cleaning and servicing of the second largest electric coal plant in the U. S. Brown was responsible for safety, quality, customer service, payroll, maintenance, writing bids, hiring, and firing of employees, budgeting, and management of staff.

20. Brown has also worked for Ford Motor Company and Frito-Lay. He came to Valvoline with a proven track record of success.

21. When Brown started working for Valvoline at its La Porte, Texas plant in February of 2020, he immediately noticed a discriminatory environment.

22. All the managers were Caucasian while all the subordinate shift supervisors and material handlers were African American.

23. Brown had interviewed for a managerial position, and he could not figure out why Motz, a far less qualified Caucasian who is no longer employed by Valvoline, was chosen over him until he arrived at the plant and saw how it was organized and operated.

24. The Caucasians were in charge there, and the African Americans held inferior positions and were treated unfairly.

25. If Brown was Caucasian, he would have received the position over Motz.

26. The Caucasian management failed to provide any orientation or training, and unsurprisingly, the plant was not running smoothly due to these failures of management.

27. Motz and Harris, the Plant Manager, were under pressure because of their mismanagement of the plant. Motz and Harris yelled at, threatened, and blamed their subordinate African American employees for their own shortcomings. This was a common occurrence.

28. The subordinate African American employees knew that they were the scapegoats for their Caucasian management, but they understood that they had to keep quiet if they wanted to keep their jobs. This created racially charged hostility in the workplace, and it affected the African American employees' ability to do their jobs.

29. Jamie Langston, a Caucasian manager, yelled at an African American loader/unloader named Craig Price that he was a "lazy boy."

30. The context and tone, as well as Langston prefacing the word "boy" with "lazy," indicate that he intended to direct both words at Price in a discriminatory manner.

31. Price reported Langston's remark to his supervisor, Brown.

32. Price was shocked and hurt that Langston would say something like that out loud. Price's shift had just started, and he was trying to get a forklift to work so he could do inventory. Langston raised his voice and called him a "lazy boy" in front of his coworkers, who were nearby on the receiving dock. Price and Brown knew what Langston meant, that he was a "lazy Black boy," which is why Price was shocked he said it out loud.

33. Langston was never disciplined or corrected by Harris or Motz or anyone else.

34. Motz, the Assistant Plant Manager and second-in-charge under Harris, made a discriminatory remark in the workplace to Price as well.

35. Price was supposed to receive some T-shirts as an incentive bonus, and Price stopped Motz one day to ask him about the shirts.

36. Motz's reply was, "You people always want something for free."

37. Price reported Motz's remark to his supervisor, Brown. Price and Brown knew exactly what Motz meant, that "Black people always want something for free."

38. In May 2020, Harris called Brown into his office to have a word. With a big smile on his face, Harris told Brown that some of the workers on the floor were calling each other "bitch-ass nigger," "Uncle Tom nigger," and "punk-ass nigger."

39. Harris did not deny saying that to Brown.

40. By the smirk on his face, it was apparent that Harris took great joy in saying that word to Brown, *and* he wanted Brown to be aware of that fact.

41. Brown was stunned and highly offended, and he had to tell Harris that he could "stop saying that word now."

42. Harris then asked Brown what should be done about the workers, and Brown said they should be fired.

43. Brown reported Harris to Harris's supervisor, Rob Shelton.

44. In July or August of 2020, Harris told Brown that he "needed more diversity in the workplace," which Brown understood as Harris wanting to reduce the number of African Americans working at the plant, given that the workforce at the La Porte plant was predominantly African American.

45. Harris also made it a point to repeatedly tell Brown about how smart his new Caucasian administrator was, so smart, in fact, that he was tasked with tracking attendance. The previous administrator was an African American woman, and Harris did not allow her to track attendance because he thought she was "too close with the hourly employees."

46. Brown documented this interaction with Harris in a written statement, dated August 1, 2021: "Around July/August of 2020 I was having a conversation with Frank Harris and he stated we needed more diversity in our workplace. At that time it was majority African American. Frank exclusively does the hiring and has hired more non-African Americans than any other race."

47. On another occasion, Harris and Motz summoned Brown for a meeting. Motz started the meeting by saying Brown needed to go back and verify last year's attendance for twenty people in three days, including verifying months prior to Brown's employment at the plant.

48. Brown told Motz it was Motz's responsibility to verify the times, and that he will not falsify paperwork and 'verify' attendance records when he was not there. Brown also reminded Motz that he had emailed him about getting this done before the end of the year, to which Motz lied and said Brown did not send him any such email.

49. Harris asked Motz if Brown sent him an email and Motz responded, "No." Brown told Motz that he was not telling the truth, and Harris then told Brown to stop blaming other people.

50. The tone of this meeting then shifted drastically. Motz told Brown, who was supposed to be leaving for vacation the following week, that he had already used up all his vacation time and that he would not be going anywhere.

51. Then, Motz and Harris started taking turns berating Brown. Brown suddenly felt very threatened, wanting to get out of Harris's office and away from this abuse and hostility.

52. Brown pulled out his phone to call HR and headed for the door.

53. Harris then threatened discipline up to termination if Brown dared to leave his office. Brown was forced to stay in the office with Harris and Motz until Harris decided Brown could leave.

54. On the publicly available Facebook page bearing his full name, "Dalan Meredith Motz," along with numerous pictures of his face, Motz has made or endorsed numerous race-related, misogynist, or derogatory remarks through posts he has intentionally shared on his publicly available Facebook page.

55. The following posts were made while Motz was employed as a manager and working at Valvoline La Porte:

• **"Please don't let the photo get out[,] it could destroy the ideas [sic] of white privilege!"** (Sept.1, 2020, Facebook Post by Motz);

• **"The most common words people misuse: Two, To, Too[,] There, Their, They're[,] and Racist."** (August 8, 2019, Facebook Post by Motz);

• **"Why do police get to riots early? To beat the crowd."** (Sept. 10, 2020, Facebook Post by Motz);

• **"So[,] they tear down all the monuments that remind us of slavery[,] [t]hen create a holiday to remember slavery."** (June 24, 2021, Facebook Post by Motz);

• **"'I won't stand while the national anthem is played.' 'That's okay[,] it's not being played for pussies like you."** (Sept. 17, 2020, Facebook Post by Motz);

• **"At least woman's [sic] sports haven't been cancelled[.]"** (Aug. 15, 2020, Facebook Post by Motz);

• **"Lemme [sic] get this straight[:] black people who were never actual slaves, are fighting white people who were never actual Nazis, about removing a statute built by Democrats,**

7

**because Democrats hate their own history, and it's all Donald Trump's fault?"** (June 22, 2020, Facebook Post by Motz); and

- **"We went from 'flatting the curve in 14 days' to 'going door-to-door to see your papers[.]' Gotta [sic] admit, I did N-A-Z-I that one coming[.]"** (July 11, 2021, Facebook Post by Motz).

56. Brown made numerous complaints about the racially hostile work environment he was subjected to. In retaliation, Harris reduced Brown's job responsibilities and gave him menial tasks doing daily audits.

57. On January 3, 2022, Brown was constructively discharged: "Due to the ongoing hostile and racist work environment I was subjected to on a regular basis and the lack of HR support, I have decided to resign as of January 3, 2022."

58. Brown received the following response from Valvoline: "We are sorry to hear about your resignation. Employee Relations has investigated the concerns you raised prior to your commencement of leave, as well as having investigated your earlier concerns in September 2020 and they were not able to substantiate your claims."

59. Conversely, when Brown complained to HR about being trapped in that meeting with Harris and Motz, *Brown* was issued a final warning by HR because Harris and Motz reported that Brown was threatening *them* during the meeting.

60. Valvoline is willing to substantiate allegations when they are made by Caucasians, but not when they are made by African Americans like Brown.

## COUNT I
### Against Defendant Valvoline
### Title VII: Hostile Work Environment Based on Race

61. Brown incorporates all the allegations in the preceding paragraphs as if the same were fully rewritten here.

62. Brown, an African American man, was subjected to a hostile work environment based on his race.

63. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, has been interpreted to protect an employee's right to work in an environment free from discriminatory intimidation, ridicule, and insult. Courts consider the totality of the circumstances in deciding whether harassment alters the victim's conditions of employment and creates an abusive work environment.

64. The Supreme Court has explained that a "supervisor's power and authority invests his or her harassing conduct with a particular threatening character[,]" making such harassment more serious. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998).

65. The conduct and comments to Brown were all unwelcome and were sufficiently severe or pervasive to alter the conditions of Brown's employment to create a racially hostile and abusive work environment, ultimately culminating in his wrongful, constructive termination.

66. In *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993), the Supreme Court asked lower courts faced with harassment claims to consider "all of the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance."

67. A reasonable person in Brown's circumstances would consider the working environment to be abusive and hostile.

68. Valvoline knew of the racial harassment directed towards Brown by its managers, but it failed to take corrective action.

69. As a direct and proximate result of Valvoline's intentional discriminatory conduct, in violation of 42 U.S.C. § 2000e-2, Brown has suffered pecuniary and emotional injuries.

## COUNT II
### Against Defendants Valvoline, Harris, and Motz
### 42 U.S.C. § 1981: Hostile Work Environment Based on Race

70. Brown incorporates all the allegations in the preceding paragraphs as if the same were fully rewritten here.

71. 42 U.S.C. § 1981 prohibits discrimination based on race, color, and ethnicity when making and enforcing contracts.

72. Section 1981 specifically grants all individuals within the U. S. jurisdiction the same rights and benefits as "enjoyed by white citizens" regarding contractual relationships (42 U.S.C. § 1981(a)).

73. Courts have interpreted Section 1981 to apply to the employment context, including at-will employment.

74. The severity of the epithets spoken at issue in this case alone demonstrate that Brown suffered from a hostile work environment based on race. Use of the term "nigger" is, by itself, extremely serious. As the Fifth Circuit acknowledged only three years ago, many courts of appeals "have found instances where the use of the N-word itself was sufficient to create a hostile work environment." *Collier v. Dallas Cnty. Hosp. Dist.*, 827 F. App'x 373, 377 (5th Cir. 2020).

75. The word is "pure anathema to African-Americans." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001).

76. Additionally, the totality of the circumstances supports a pervasive hostile work environment because although not expressly based on race, other conduct was part of the same discriminatory course of conduct.

77. As a direct and proximate result of the intentional discriminatory conduct, in violation of 42 U.S.C. § 1981, Brown has suffered pecuniary and emotional injuries.

## COUNT III
### Against Defendants Valvoline, Harris, and Motz
### 42 U.S.C. § 1981: Retaliation

78. Brown incorporates all the allegations in the preceding paragraphs as if the same were fully rewritten here.

79. Section 1981 also prohibits retaliation. Brown engaged in protected activity when reported Harris to Harris's supervisor, Rob Shelton, after Harris repeatedly used the N-word to Brown's face in the workplace.

80. Brown made numerous complaints about the racially hostile work environment he was subjected to and in retaliation, Harris reduced Brown's job responsibilities and gave him menial tasks doing daily audits.

81. The hostile work environment perpetuated by Valvoline, Harris, and Motz in retaliation for Brown making complaints about race discrimination led to his constructive and wrongful termination from Valvoline.

82. As a direct and proximate result of the intentional discriminatory conduct, in violation of 42 U.S.C. § 1981, Brown has suffered pecuniary and emotional injuries.

## COUNT IV
### Against Defendant Valvoline
### 42 U.S.C. § 1981: Failure To Hire To Managerial Position Based On Race

83. Brown incorporates all the allegations in the preceding paragraphs as if the same were fully rewritten here.

84. Section 1981 applies to all private employers and labor organizations.

85. Section 1981 does not require an individual to exhaust administrative remedies by filing a charge before any government agency and waiting for that charge to be adjudicated or released before proceeding to court.

86. There is no damages cap under Section 1981.

87. When Brown started working for Valvoline at its La Porte, Texas plant in February of 2020, he immediately noticed a discriminatory environment that remained throughout his employment, as described above.

88. All the managers were Caucasian while all the subordinate shift supervisors and material handlers were African American.

89. Brown interviewed for a managerial position, and he could not figure out why far less qualified Motz was chosen over him until he arrived at the plant and saw how it was structured, organized, and operated. The Caucasians were in charge there, and the African Americans held inferior positions and were treated unfairly.

90. If Brown was Caucasian, he would have received the position over Motz.

91. As a direct and proximate result of the intentional discriminatory conduct, in violation of 42 U.S.C. § 1981, Brown has suffered pecuniary and emotional injuries.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jeffrey Brown respectfully requests that the Court grant judgment against Defendants, jointly and severally, as follows:

A. That the Court award Plaintiff past and future compensatory damages, economic, noneconomic, back pay, front pay, emotional distress, in an amount to be proven at trial;

B. That the Court award Plaintiff punitive damages against each Defendant and their agents, servants and/or employees in an amount to be proven at trial due to their willfulness, wantonness, recklessness and conscious disregard for Plaintiff's rights;

C. That the Court award Plaintiff attorney and expert fees, costs, and interest; and

D. That the Court award Plaintiff such other and further relief as may be just, equitable and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable with the maximum number of jurors permitted by law.

Respectfully submitted,

/s/ Lewis A. Zipkin
Lewis A. Zipkin, Esq. (Ohio Bar No. 0030688)
Kevin M. Gross, Esq. (Ohio Bar No. 0097343)
ZIPKIN WHITING CO., L.P.A.
3637 Green Road
Beachwood, Ohio 44122
Phone: (216) 514-6400
Fax: (216) 514-6404
Email: lawsmatter2@gmail.com
       kgross.zipkinwhiting@gmail.com

*Pro Hac Vice Counsel for Plaintiff Jeffrey Brown*

*and*

/s/ Melissa B. Carr
--------
Melissa B. Carr, Esq. (Texas Bar No. 24065008)
S.D. Tex. Federal ID No. 3667785
DuBois, Bryant & Campbell, LLP
303 Colorado Street, Suite 2300
Austin, Texas 78701
Phone: (512) 457-8000
Fax: (512) 457-8008
Email: mcarr@dbcllp.com

*Texas Counsel for Plaintiff Jeffrey Brown*