United States District Court
Southern District of Texas
**ENTERED**
June 11, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JEFFREY BROWN, | § | |
| | § | |
| *Plaintiff,* | § | |
| VS. | § | CIVIL ACTION NO. 4:22-cv-04059 |
| | § | |
| VALVOLINE, LLC, and FRANK HARRIS, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| | § | |

## ORDER

Pending before the Court is Defendants Frank Harris ("Harris") and Valvoline, LLC's ("Valvoline") (collectively, "Defendants") Motion for Summary Judgment and Brief in Support. (Doc. No. 24). Plaintiff Jeffrey Brown ("Plaintiff" or "Brown") has responded in opposition (Doc. No. 25), and Defendants replied. (Doc. No. 26). Defendants also filed Objections to Plaintiff's Summary Judgment Evidence (Doc. No. 27), to which Plaintiff did not respond. For the reasons articulated below, the Court **GRANTS** Defendants' Motion for Summary Judgment. (Doc. No. 24).

## BACKGROUND

This is an employment discrimination case. Brown, an African American man, worked as a Production Supervisor at Valvoline's La Porte, Texas plant. Shortly after he began working at the plant in February 2020, Brown alleges that he noticed a "discriminatory environment." (Doc. No. 25 at 3). He noticed that "all the managers were Caucasian while all the subordinate shift supervisors and material handlers were African American." (*Id.*). Brown alleges that the plant was mismanaged and Valvoline managers Dalan Motz ("Motz") and Harris, Brown's direct supervisor,

"yelled at, threatened, and blamed their subordinate African American employees." (Doc. No. 25 at 4). On one occasion, Harris used racial slurs in Brown's presence. In December 2020, Brown contends that he was subjected to a "hostile" meeting in which he was threatened with termination if he submitted reports about Harris and Motz's behavior to Harris' supervisor or Human Resources ("HR"). Brown further alleges that, in retaliation for his internal reporting, Harris reduced Brown's job responsibilities and assigned him menial tasks. It is undisputed that Brown was out on various leaves of absence "for the vast majority of 2021." (Doc. No. 24 at 12). On January 3, 2022, Brown submitted his resignation. He alleges that he was constructively discharged.

Brown asserts four causes of action against Valvoline: a claim for hostile work environment based on race under Title VII, a claim for hostile work environment based on race under 42 U.S.C. § 1981, a claim for retaliation under § 1981, and a failure to hire claim under § 1981. Brown also states two individual claims against Harris for retaliation and hostile work environment under § 1981.[1]

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant

---

[1] Brown originally asserted individual claims against Motz, but the Court dismissed those claims in a previous Order. (Doc. No. 28).

2

then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

## ANALYSIS

### I. Defendants' Objections to Plaintiff's Summary Judgment Evidence

Defendants object to Brown's Declaration, arguing that it contains "impermissible, conclusory assertions that are objected to and routinely struck in employment cases." (Doc. No. 27 at 2). Defendants move to strike all "conclusory allegations" and "speculation about other employees' experiences and other individuals' states of mind" from Plaintiff's Declaration. Plaintiff did not respond to Defendants' objections. The Court notes as a general matter that a witness may testify only to facts of which he has personal knowledge. Mere "speculation or conjecture" is inadmissible. *See* Fed. R. Evid. 602 Advisory Committee Notes (1973). Conclusory allegations are inappropriate as well. Although there is some authority for the argument that non-movant's affidavits "should not be held to as strict a standard as those of the movant for summary judgment," the Fifth Circuit has found no abuse of discretion in striking portions of an affidavit where they are not based on the affiant's personal knowledge. *Richardson v. Oldham*, 12 F.3d

3

1373, 1378 (5th Cir. 1994). The Court will address Defendants' specific objections to Brown's Declaration if the evidence becomes relevant to the Court's analysis.

## II. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on each of Brown's claims, including the Title VII hostile work environment claim against Valvoline, the § 1981 hostile work environment claims against Valvoline and Harris, the § 1981 retaliation claim against Valvoline and Harris, and the § 1981 failure to hire claim against Valvoline. The Court will address each argument in turn.

### a. Brown's § 1981 Failure to Hire Claim against Valvoline

Valvoline argues that it is entitled to summary judgment on Brown's § 1981 failure to hire claim because Brown was hired in the management role he applied for and "has no evidence that he even applied for any other positions." (Doc. No. 24 at 25). Brown responds only that "he was led to believe that he was applying for an 'assistant plant manager position'" during the interview and that he was "the victim of a bait-and-switch, as Motz, who was in the room during Brown's interview, was the one who received the position." (Doc. No. 25 at 17). Brown's proffered evidence includes deposition testimony stating that he was led to believe he was interviewing for an "assistant plant manager" position. (Doc. No. 25-1 at 28:09-12). He does not give the Court any evidence to support this conclusory statement in the deposition.

"Section 1981 race discrimination claims are governed by the same evidentiary framework applicable to Title VII employment discrimination claims." *Brown v. AT&T Services Inc.*, 236 F. Supp. 3d 1000, 1006 (S.D. Tex. 2017). "Under the burden-shifting framework, a plaintiff must prove his *prima facie* failure to hire case by showing that he was: (1) a member of a protected class; (2) applied for an open position; (3) qualified for the position; (4) not selected for the position; and (5) the employer continued to seek applicants for the position or filled the position

by someone outside the protected class." *Id.* (citation omitted). "If the *prima facie* burden is met, the burden then shifts to the defendant to offer a legitimate, non-discriminatory reason to not hire the plaintiff." *Id.* (citing *Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016)). "The burden then shifts back to the plaintiff to show the reason proffered was pretext for discrimination." *Id.* (citation omitted). "A plaintiff must put forth evidence rebutting each of the nondiscriminatory reasons the employer articulates." *Id.* (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)).

According to a sworn affidavit by the Plant Manager of Valvoline's Deer Park facility, Rob Shelton ("Shelton"),[2] Brown never submitted an application for an "assistant plant manager" position at the La Porte plant. (Doc. No. 24-5 at 2). Instead, it is undisputed that Brown applied for the Production Supervisor role in 2020 and was ultimately hired for that role. Shelton interviewed Brown for the Production Supervisor role at the time of his original application. (Doc. No. 24-5 at 2-3). Moreover, Motz was already serving as "Interim Plant Manager" when Brown was hired, and served in that role only until Harris was hired as the full-time Plant Manager. (Doc. No. 24-5 at 3). Accordingly, Brown could not have been the victim of a "bait-and-switch" for a role that was already filled. Brown has not offered any evidence creating a genuine issue of material fact that he submitted an application for an open "assistant plant manager" position and was not selected.[3] As a result, he fails to establish a *prima facie* failure to hire claim under § 1981. Even if Brown had evidence raising a fact issue to support a *prima facie* case, there is no evidence that the "failure to hire" him in a role already temporarily filled by another employee (Motz) was

---

[2] According to the affidavit, the Plant Manager of Valvoline's La Porte facility (where Brown worked) reports directly to the Plant Manager of the Deer Park facility. (Doc. No. 24-5 at 2-3).
[3] Brown has not cited (and the Court has not found) any cases in which a plaintiff raises a genuine issue of material fact on a Section 1981 failure to hire claim despite the fact that the plaintiff was hired in the position for which he actually applied.

pretextual. As a result, this claim would fail either way. The Court grants summary judgment in Defendants' favor on Brown's failure to hire claim against Valvoline.[4]

### b. Brown's Hostile Work Environment Claims

The Court next addresses Brown's Title VII and § 1981 hostile work environment claims against Valvoline, and his § 1981 hostile work environment claim against Harris.

As noted previously, "Section 1981 race discrimination claims are governed by the same evidentiary framework applicable to Title VII employment discrimination claims." *Brown v. AT&T Services Inc.*, 236 F. Supp. 3d 1000, 1006 (S.D. Tex. 2017).

As to the individual § 1981 hostile work environment claim against Harris, the Fifth Circuit has noted that an individual may be liable under § 1981 if he is "essentially the same" as the employer in exercising authority over the plaintiff. *Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 337 (5th Cir. 2003).[5] Brown failed to respond to Defendants' arguments as to this issue on summary judgment. Although this Court previously found that Brown sufficiently alleged that Harris was a "supervisor" at the pleadings stage, Brown has not cited to any evidence suggesting that Harris was "essentially the same" as Valvoline such that he can be held individually liable pursuant to a hostile work environment claim under § 1981. The Court therefore finds that this argument has been waived. *See Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002).

---

[4] Defendants did not raise the issue of whether Brown's failure to hire claim is barred by the applicable statute of limitations. Failure to hire claims were available to plaintiffs prior to the Civil Rights Act of 1991; as a result, the most analogous state statute of limitations applies rather than the four-year catch-all statute of limitations for causes of action involving intentional discrimination after contract formation. *See Nicholson v. A.H.D. Houston, Inc.*, No. 4:21-CV-02624, 2022 WL 4543201 at *4 (S.D. Tex. Sept. 28, 2022). Under Texas law, the Texas Commission on Human Rights Act ("TCHRA") is the most analogous. Employment discrimination cases brought under the TCHRA are subject to a two year statute of limitations. Brown would have been aware of his position as Production Supervisor rather than "assistant plant manager" on the first day of his employment at Valvoline. He was hired in February 2020; thus, any "failure to hire" claim would be barred long before he filed suit in November 2022.

[5] Unlike claims under Title VII, Section 1981 actions are available against "non-employer defendants" such as individual supervisors and fellow employees. *Foley.*, 355 F.3d at340 n.8. The extent of individual liability under § 1981, however remains unsettled in this Circuit.

6

Even assuming *arguendo* that Harris could be held individually liable under § 1981, however, his claim would still fail.

The Court considers the merits of the claim against Harris simultaneously with the Title VII and § 1981 hostile work environment claims against Valvoline, as the same framework applies to each claim. To establish a claim of hostile work environment under Title VII or § 1981, a plaintiff must show the following:

> (1) [He] belongs to a protected group; (2) [he] was subjected to unwelcomed harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; [and] (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Mendoza v. Helicopter*, 548 Fed. Appx. 127, 128-29 (5th Cir. 2013) (citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

"For harassment to alter the conditions of a person's employment, the conduct complained of must be both objectively and subjectively offensive." *Price v. Valvoline, L.L.C.*, 88 F.4th 1062 (5th Cir. 2023) (*citing EEOC v. WC&M Enters.*, 496 F.3d 393, 399 (5th Cir. 2007)). "To determine whether the victim's work environment was objectively offensive, courts consider the totality of the circumstances, including 1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance." *Id.*

Brown argues that he was subjected to a hostile work environment when Harris used the full N-word during a meeting. (Doc. No. 25 at 10). Brown argues that "use of this epithet by a supervisor is actionable, and Harris admits to having used the word." (*Id.*). Defendants contend that the use of the N-word essentially amounts to a stray remark that was not directed at Brown and was "simply re-telling [Brown] what had transpired in the workplace between two subordinate employees." (Doc. No. 24 at 22).

7

The facts presented to the Court are as follows: in May 2020, two African American employees "exchanged hostile words" with one another at the La Porte plant, "including the use of the N-word." (Doc. No. 24 at 15). Harris had a meeting to ask Brown whether the employees should be disciplined. It is undisputed that when Harris spoke with Brown, he repeated the exact phrases used by the African American employees during their exchange. Harris states in his affidavit that he repeated the phrases to seek advice on how the employees should be disciplined. (Doc. No. 24-7 at 4). Brown does not dispute this, but recalls that he told Harris to "stop," and Brown instructed Harris that he could simply use the term "N-word" instead. (Doc. No. 25-1 at 58:19-25). Brown believes that the use of the racial slurs was intended to be directed at him because "[Harris] kind of had this little grin on his face, and he just kept using that word like he had a hall pass to just go ahead and keep saying it to me." (Doc. No. 25-1 at 59:22-60:5). Brown recalls that Harris ceased using the language after Brown told him to stop. (Doc. No. 25-1 at 60:13-23).

On a separate occasion, Harris told Brown that the plant needed "more diversity around here," which Brown speculates to be a veiled reference to the large number of African American employees at the plant. (Doc. No. 25-1 at 46:17-21). Brown further avers in his Declaration that Harris "made it a point to repeatedly tell Brown about how smart his new Caucasian administrator was, so smart that she was tasked with tracking attendance." (Doc. No. 25-2 at 2). Finally, according to Brown's deposition testimony, Harris referred to some other African American employees as "a bunch of knuckle heads." (Doc. No. 25-1 at 46:01-04).

The Fifth Circuit recently considered conduct by employees at the same La Porte, Texas Valvoline plant in a race discrimination case filed by another former employee, Craig Price. *See Price*, 88 F.4th 1062 (5th Cir. 2023). In that case, Price, an African American man, alleged that his supervisor called him a "lazy boy" when he was unable to get a forklift to work. *Price v.*

8

*Valvoline, LLC*, No. 4:21-CV-03683, 2023 WL 2796499 (S.D. Tex. Mar. 3, 2023), *aff'd sub nom. Price v. Valvoline, L.L.C.*, 88 F.4th 1062 (5th Cir. 2023). Additionally, Price alleged that Motz responded that "you people always want something for free" after Price asked him about an incentive bonus t-shirt that he was due to receive. *Id.* Although the Fifth Circuit recognized that the terms "boy" and "you people" have "historically been used in demeaning ways towards Black men," the Court noted that "where, as here, there are only two instances of their use, the terms are insufficiently severe to establish a hostile work environment under our precedent." *Price*, 88 F.4th at 1067. The Court cited *Collier v. Dallas Cnty. Hosp. Dist.*, in which "two instances of racial graffiti and being called 'boy' were not sufficiently severe or pervasive to alter the conditions of the victim's employment." 827 Fed. Appx. 373, 377-78 (5th Cir. 2020). The Circuit also considered Harris' alleged comment regarding "diversity in the workplace." *Price*, 88 F.4th at 1065. Ultimately, the Court found that "these comments were not physically threatening, and [plaintiff] does not claim that he was humiliated by them, rendering each comment 'merely an offensive utterance' insufficient to establish a hostile work environment." *Id.* at 1067.

Similarly, in *Frazier v. Sabine River Auth. Louisiana*, the Fifth Circuit found that a co-worker's use of the N-word, along with other offensive language and gestures, was "isolated" based on its review of the "total record" and "not severe or pervasive enough to support a hostile work environment claim." 509 Fed. App'x 370, 374 (5th Cir. 2013).

The Court recognizes that the use of the N-word is highly objectionable. Indeed, it has been described as "the most noxious racial epithet in the contemporary American lexicon." *Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 401 (5th Cir. 2021) (internal citations omitted). Nonetheless, for a work environment to be deemed sufficiently hostile, this Court must consider all the relevant circumstances, including the frequency of the conduct, whether it was physically threatening or

9

humiliating, and whether it unreasonably interfered with Brown's work performance. *Frazier*, 509 F. App'x at 374. In this case, according to the uncontroverted evidence, the use of the language was isolated to the single alleged incident when Harris was seeking advice from Brown as to how to handle a disciplinary situation pertaining to two subordinate employees. While he used the actual N-word to explain what happened in the altercation, Harris ceased using the objectionable language when asked to stop, and Brown does not allege that he was physically threatened or that it unreasonably interfered with his work performance. (Doc. No. 25-2 at 40, Doc. No. 25-1 at 40:6-11). Moreover, the additional comments cited by Brown as evidence of a hostile work environment (e.g., Harris' comments regarding "need[ing] more diversity around here") are unrelated and Brown has not raised a genuine issue of fact that they were anything other than stray remarks. Additionally, the term "knuckle heads," without more, does not implicitly carry racial implications. Importantly, Brown has not shown that any harassment was frequent – instead, it is undisputed that Harris' use of the racial epithet occurred on the one occasion described above in a singularly unique situation. Considering the relevant context and the summary judgment evidence presented to the Court, Brown has failed to make the required showing to survive summary judgment on each of his hostile work environment claims. The Court grants summary judgment in Defendants' favor on all of Brown's Title VII and § 1981 hostile work environment claims against Harris and Valvoline.

### c. Brown's Retaliation Claims

Defendants next move for summary judgment on Brown's § 1981 race-based retaliation claim. As discussed previously, "Section 1981 race discrimination claims are governed by the same evidentiary framework applicable to Title VII employment discrimination claims." *Brown*, 236 F. Supp. at 1006 (S.D. Tex. 2017).

Brown's retaliation claim appears to be based on a "pretext" theory. "Under the pretext framework, after the employee demonstrates a *prima facie* case of retaliation and the employer carries its burden by stating a legitimate non-retaliatory reason for the employment action, the burden falls to the employee to establish that the employer's permissible reason is actually a pretext for retaliation." *Septimus v. Univ. of Houston*, 399 F.3d 601, 607 (5th Cir. 2005).

The plaintiff must first establish a *prima facie* case of retaliation. To do so, he must show that he engaged in a protected activity, that an adverse employment action occurred, and that a causal link existed between the protected activity and the subsequent adverse action. *Id.* at 610.

Defendants argue that Brown's retaliation claims fail at the *prima facie* case stage because he has not articulated actionable adverse employment actions. Plaintiff appears to argue that the following discrete events constitute adverse employment actions in the retaliation context:

1. Brown was called into meeting with Motz and Harris that turned "hostile" when Brown challenged new attendance tracking practices.
2. In the meeting, Harris allegedly threatened Brown with termination.
3. After the meeting, Brown was issued a "Final Written Warning" putting Brown on notice that further transgressions could result in termination.
4. Brown's work responsibilities were "reduced," and he characterizes his new assignments as "menial tasks, such as doing daily audits." (Doc. No. 25-2 at 3).
5. Brown alleges that he was constructively discharged when he voluntarily resigned after a prolonged leave of absence.

The Court will consider each alleged adverse employment action in turn.

a. **Alteration or Reduction in Work Responsibilities**

Brown claims that he was assigned reduced job responsibilities and "menial tasks" in retaliation for internal complaints he submitted to HR. While "retaliatory work assignments" are widely recognized as a form of retaliation, the Supreme Court has held that "reassignment of job

11

duties is not automatically actionable" and whether a particular reassignment is materially adverse depends on the context and should be judged from the perspective of a reasonable person in the plaintiff's position "considering all the circumstances." *Burlington*, 548 U.S. at 71. Defendants argue that Brown's allegations of reduced job responsibilities "cannot form the basis of a retaliation claim" because he has not established that they were materially adverse. (Doc. No. 24 at 23). The crux of Brown's allegations center around Harris' alleged assignment of Brown to "menial tasks doing daily audits." (Doc. No. 1 at 6).

Brown admits in his deposition that "it's just kind of standard to audit or check your inventory on a regular basis." (Doc. No. 25-1 at 45:12-13). He alleges that "we had just hired an admin whose entire job it was to do audits" but that Harris "was having—he was having me and [other Production Supervisors at the plant] do the audits instead." (Doc. No. 25-1 at 45:10-15). Based on this testimony, it appears to be undisputed that audits (of inventory or otherwise) were a "standard" part of the Production Supervisor role, and that Brown, along with the other Production Supervisors, were tasked with completing them. There is no suggestion that the other Production Supervisors were being retaliated against when they were asked to complete "audits." Moreover, Defendants have presented evidence that while a new administrative assistant was hired to assist with clerical functions, Production Supervisors were still ultimately responsible for addressing attendance-related issues and that "inventory audits" were performed by all Production Supervisors. (Doc. No. 24-7 at 3-4). The Court finds that Brown has failed to raise a genuine issue of material fact that the assignment of "audits" or other responsibilities as alleged in the Complaint was nothing more than a "minor change in working conditions" (if it was a change at all) that the Fifth Circuit has found to fall short of "materially adverse" in the retaliation context. *Wheat v.*

*Florida Par. Juvenile Justice Comm'n*, 811 F.3d 702, 709 (5th Cir. 2016). The Court therefore grants Defendants' summary judgment motion as to this issue.

### b. Meeting with Motz and Harris

Brown alleges that the December 2020 meeting with Motz and Harris, along with the subsequent Final Written Warning threatening termination, constitute adverse employment actions. Defendants disagree. According to Defendants, Motz and Harris met with Brown to "discuss a new attendance occurrence and PTO tracking system applicable to hourly employees and his responsibilities under the new system." (Doc. No. 24 at 11).

Brown's characterization of the December 2020 meeting with Motz and Harris differs from that of Defendants. At his deposition, Brown "[did] not recall discussing PTO" at the meeting, although he did remember that it "was not a structured meeting" and that a new attendance policy was discussed, and also included a discussion of several previous attendance records that Brown was asked to verify. (Doc. No. 25-1 at 71:17-73:11, 63:02-10). Brown apparently disagreed with Motz's directive to verify attendance records that did not have the comments usually written by Motz included on the records. (Doc. No. 25-1 at 65:01-24). At some point, Brown indicated that he wanted to reach out to Rob Shelton, the Plant Manager of the Deer Park facility and Harris' supervisor. (Doc. No. 25-1 at 69:16-70:05). Brown alleges that Harris responded by saying that "if [Brown] left the office" or "got in touch with Rob [Shelton]," he was going to terminate [Brown]." (*Id.*). An argument apparently ensued.[6] Eventually the meeting ended. In January 2021, Brown received the Final Written Warning from HR, signed by Shelton and Harris, indicating that further behavioral transgressions would result in Brown's termination. (Doc. No. 24-9). Brown alleges

---

[6] The Final Written Warning proffered by Valvoline states that at this point Brown became "defensive," and "[held] up his phone in a combative and confrontational posture." (Doc. No. 24-9 at 3).

13

that he sent in an internal complaint of his own.[7] Ultimately, Brown believes that he was issued the Final Written Warning "because Harris and Motz retaliated by falsely reporting to HR that Brown was the one making threats." (Doc. No. 25-1 at 77:16-25).

The anti-retaliation provision of Title VII (and, by extension, Section 1981) "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67 (2006). "A plaintiff must show that a reasonable employee would have found the challenged action materially adverse." *Id.* The Supreme Court has noted that it "speak[s] of material adversity because…it is important to separate significant from trivial harms." *Id.* at 68. Title VII (and Section 1981) do not set forth "a general civility code for the American workplace." *Id.* Indeed, "the significance of any given act of retaliation will often depend upon the particular circumstances," and "context matters." *Id.* at 69.

In the retaliation context, "allegations of unpleasant work meetings, verbal reprimands, improper work requests, and unfair treatment" are not adverse employment actions. *King v. Louisiana*, 294 Fed. Appx. 77 (5th Cir. 2008). As a result, Brown's general allegation of a "hostile meeting" as an adverse employment action is not actionable.

Taken in the light most favorable to Brown, the only alleged conduct during and after the December 2020 meeting that a reasonable employee would have found to be materially adverse is Harris' alleged threat of termination when Brown attempted to leave the office and the Final Written Warning he was subsequently issued. (Doc. No. 24-9 at 3). Both the verbal threat of termination by Harris and the "Final Written Warning" arguably qualify as actions that a

---

[7] It is not clear whether there is documentation of this complaint, nor is it clear when or if it was sent. Brown testified that he does not remember who he complained to (Doc. No. 25-1 at 77:19-20) and that he sent an email to "whoever [he] thought would be in the chain that could possibly help [him]." (*Id.* at 77:23-25). He does not believe he ever received any substantive follow-up to that email. (*Id.* at 78:01-10).

14

reasonable employee would find materially adverse.[8] Even assuming, however, that the verbal threat of termination during the December 2020 meeting and the Final Written Warning after the meeting constituted adverse employment actions, Brown must also raise a genuine issue of material fact that he engaged in protected activity, and that the protected activity and the adverse employment action(s) were causally related.

Brown claims that the December 2020 meeting (and, by extension, the threat of termination and Final Written Warning) occurred in retaliation for various HR reports that he filed against Harris. (Doc. No. 25 at 16; Doc. No. 25-1 at 49:01-22).[9] Specifically, Brown argues in his response that he "suffered adverse employment actions in response to having utilized Valvoline's HR hotline, because Valvoline was notifying Harris that Brown had called in and complained about Harris's use of the [N-word]." (Doc. No. 25 at 15). He does not cite (nor does he proffer) any evidence to support this contention.[10] In his deposition, Brown admitted that did not recall the first time he complained to HR but said that he "made several complaints" starting in May or June 2020

---

[8] As the Fifth Circuit has held, an adverse employment action for the purposes of Title VII retaliation "need only be one that a reasonable employee would have found 'materially adverse,' meaning 'it...might have dissuaded a reasonable worker from making or supporting [protected activity]." *Johnson v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, 90 F.4th 449, 461 (5th Cir. 2024). The Final Written Warning included the following language: "Any future incident of unprofessional behavior/communication will result in termination of employment." (Doc. No. 24-9 at 3). This arguably "might have dissuaded" Brown from making or supporting protected activity. The Court further notes that the Fifth Circuit has recently moved away from the "ultimate employment decision" standard for an adverse employment action in the race discrimination context, noting that "a plaintiff need only show that she was discriminated against, because of a protected characteristic, with respect to hiring, firing, or the 'terms, conditions, or privileges of employment.'" *Hamilton v. Dallas Cnty.*, 79 F.4th 494, 506 (5th Cir. 2023). With this in mind, the Court takes a broad approach to the adverse employment action analysis in this case.

[9] Q: "You said that the meeting with [Motz] and [Harris], the way that went down was in retaliation of you complaining. What—what complaint are you referring to?
[Brown]: I made several complaints. I would—I had a folder called HR folder, and I would contact—I believe her name was Mindy. [...]
Q: When was the first time that you complained to Mindy in HR?
[Brown]: I don't recall. At this time I think it was around May or June of 2020."
(Doc. No. 25-1 at 49:01-16).

[10] Brown further alleges that Harris threatened him with termination during the meeting "if [he] got in touch with Rob [Shelton, Harris' supervisor]." (Doc. No. 25-1 at 35). Brown presents no evidence that his comment during the meeting indicating his desire to "get in touch with Rob" constituted protected activity under the statute because there is no evidence concerning what behavior or incident he wanted to "get in touch with Rob" about other than the disagreement regarding attendance tracking.

about "just everything—all the things that just kept going on, the-the general attitude, the way [Harris] talked to people." (Doc. No. 25-1 at 49:1-22, 50:4-24). He further testified that eventually "Kevin from HR just blasted me and told me I'm not allowed to contact HR anymore…He said I had to take everything to [Harris]." (Doc. No. 25-1 at 50:4-24). Brown does not, however, identify the subject matter of his complaints. When asked "what exactly" he was complaining about in May or June of 2020, he responded only that "when I saw or said—heard something that was inappropriate, I would send an email to her, then I'd put it in an HR folder." (Doc. No. 25-1 at 50:04-07). This folder was not provided to the Court.

"Complaints to employers that do not complain of conduct protected by [employment statutes] do not constitute protected activities[.]" *Williams v. Racetrac Petroleum, Inc.*, 824 F. Supp. 2d 723 (M.D. La. 2010). "To qualify as a protected activity, the employee's conduct must have 'opposed' the employer's practice and that opposed practice must have been unlawful. *Scott v. U.S. Bank Nat'l Ass'n*, 16 F.4th 1204 (5th Cir. 2021), *as revised* (Nov. 26, 2021). Brown has not proffered evidence establishing which HR complaints, if any, opposed an unlawful employment practice. Nonetheless, even assuming that the various "HR reports" and use of the "hotline" were alleged constituted protected activity, Brown fails to establish a causal link between the alleged protected activity and the adverse employment actions (the Final Written Warning and verbal threat of termination during the December 2020 meeting).

"To demonstrate the third element of a *prima facie* case of retaliation— a causal connection between the protected activity and the adverse action—a plaintiff must demonstrate that the employer's decision was based in part on knowledge of the employee's protected activity." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 305 (5th Cir. 2020) (citations and internal quotation marks omitted). Brown has not offered any evidence that Harris

and/or Motz were aware of the HR reports allegedly filed by Brown in the months leading up to the December 2020 meeting.

Further, Brown does not identify the date of the complaint(s) that he alleges to be the protected activity underlying his retaliation claims other than that he filed several complaints about "inappropriate conduct" generally in May and June 2020. It is undisputed that the meeting in which Harris allegedly threatened termination occurred on December 16, 2020. It is further undisputed that the Final Written Warning issued by Valvoline was issued on January 11, 2021. (Doc. No. 24-9 at 4). Even if Brown had raised an argument (he did not) that temporal proximity alone could establish a causal connection in this case, the period of months between the reports and the meeting are likely not "close enough" to establish causality without additional evidence. The Fifth Circuit has held, for example, that a five month lapse is not close enough, "without other evidence of retaliation," to establish a causal connection. *Lyons,* 964 F.3d at 305 (citing *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 472 (5th Cir. 2002)). Brown has not proffered any other evidence of a causal link between the points of contact he had with HR and the verbal threat of termination during the December 2020 meeting or the Final Written Warning. As a result, the Court concludes that Brown has failed to meet his burden to raise a genuine issue of material fact as to causation. The Court grants summary judgment in favor of Defendants on this issue.

### c. Constructive Discharge

Brown claims that he was constructively discharged in retaliation for protected activity (the HR reports that he filed against Harris). To establish a *prima facie* case of retaliation based on constructive discharge, Brown must "prove that working conditions would have been so difficult or unpleasant that a reasonable person in [the employee's] shoes would have felt compelled to resign." *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 439-440 (5th Cir. 2005)

(citations omitted) (cleaned up). First, it is again somewhat unclear when the protected activity occurred (if at all), but the Court will assume it was the May-June 2020 contact with HR. Next, to support a claim for constructive discharge, Brown "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Id.* (citations omitted). It is undisputed that Brown did little work at the plant in 2021. He was out "on various leaves of absence" in until the summer of 2021, worked briefly in July 2021, left almost immediately, and never returned that year after he went back out on short term disability due to an injured back. (Doc. No. 24 at 12). He does not provide evidence or even claim that any untoward or hostile actions occurred during 2021.[11] He eventually submitted his resignation notice in January 2022. The Court has already granted summary judgment in favor of Defendants on the hostile work environment claims, and Brown has not identified any discrete events that made him feel "compelled" to resign more than a year after the events relevant to this lawsuit. In fact, Brown testified that he had no direct interaction with Motz during most of 2021, and "very little" interaction with Harris. (Doc. No. 25-1 at 81:02-09). As a result, Brown has not met his burden to raise a fact issue that working conditions were so unpleasant that he felt "compelled" to resign in 2022. The Court grants summary judgment to Defendants on this issue.

For the foregoing reasons, the Court hereby **GRANTS** Defendants' Motion for Summary Judgment. (Doc. No. 24). Brown's claims against all Defendants are dismissed in their entirety.

Signed at Houston, Texas, on this the 11 day of June, 2024.

Andrew S. Hanen
United States District Judge

---

[11] Brown offers a document titled "August 21, 2021 Statement by Plaintiff Jeffrey Brown" complaining about several incidents that occurred in 2020 (including Harris' comments related to diversity). (Doc. No. 25-4). It is not clear to whom this was sent, if at all. In any event, the complained-of events occurred well before the date of the letter and do not support Brown's constructive discharge claim based on his resignation in January 2022.